Argued March 9, affirmed April 20, 1955

# DICILLO ET AL. *v.* OSBORN ET AL.

282 P. 2d 611

*Roger G. Tilbury*, Portland, argued the cause for appellants.

*George J. Perkins*, Portland, argued the cause and filed a brief for respondents.

Before WARNER, Chief Justice, and ROSSMAN, LATOURETTE and PERRY, Justices.

ROSSMAN, J.

This is an appeal by the plaintiffs from a judgment of the circuit court in favor of the defendants which is based upon the verdict of a jury. The action which gave rise to the challenged judgment was in replevin and its subject matter, according to the complaint, was a "1947 Trailermobile semi-trailer."

The plaintiffs, Thomas R. Dicillo and William T. Johnston, are partners who do business under the name of Oregon Egg & Poultry Company. The two defendants, L. C. and F. L. Osborn, are brothers. They were engaged in the operation of a motor truck.

The complaint was filed July 11, 1951, and alleged that at that time the Trailermobile was in the defendants' possession. Since the action was in replevin, it was essential to its success that on July 11, 1951, the plaintiffs were entitled to the immediate and exclusive possession of the vehicle. *Winter v. Heyden,* 149 Or 20, 36 P2d 183, 37 P2d 871. In addition to averring that the plaintiffs were entitled to immediate possession, the complaint stated: "Plaintiffs now are

and at all times herein mentioned were the owners''
of the trailer.

Before proceeding to the assignments of error, we
will take notice of facts which will facilitate a con-
sideration of them. The plaintiffs' business consisted,
in part at least, of wholesale transactions in eggs, some
of which were procured in the Dakotas and Minnesota.
December 25, 1950, the defendants brought to Portland
a truckload of eggs from Dell Rapids, South Dakota,
and, in disposing of them, became acquainted with the
plaintiff Dicillo. A few days later, the defendants and
the plaintiffs effected an agreement which required
the defendants to make trips to the Middle West, load
their vehicle there with eggs and bring them to the
plaintiffs. For the purpose of reducing the cost of
hauling the eggs westerly, the agreement required
the defendants, upon the eastbound trip, to haul apples,
onions, or other produce. The plaintiffs, of course,
had no interest in the eastbound cargo, but agreed to
help the defendants obtain the loads.

The agreement of the parties was purely parole and
no memorandum of any of its terms was prepared.
Evidently the parties were at liberty to quit the ven-
ture at any time they wished. About three months after
the agreement was effected, the defendant, F. L. Os-
born, withdrew. Three months after his withdrawal,
the other defendant, L. C. Osborn, abandoned the enter-
prise and thereupon no more eggs were hauled. At that
juncture this action was filed. Since neither the plain-
tiffs nor the defendants ever handed to the other a
statement of account, the condition of affairs became
equivocal soon after the agreement was made, and be-
fore long it became the subject of dispute.

When the venture was undertaken, the plaintiffs
made no claim that they were the owners of the afore-
mentioned trailer. A few days after the commencement

of the relationship, the plaintiffs paid some sums to creditors of the defendants, at the latter's request, and, based upon the payments, they indicated in the course of the trial that they had an interest in the trailer. Johnston expressed himself in this vein: "We considered that we owned the trailer." About three months after the venture got under way, the secretary of state, at the defendants' request, transferred the certificate of title on the trailer to the plaintiffs. That circumstance constituted the major premise of the plaintiffs' assertion that they were the owners of the vehicle. We will presently return to the moneys which the plaintiffs disbursed at the defendants' request and to the transfer of the certificate of title, but meanwhile will give further attention to the agreement under which the parties operated.

So far we have mentioned only the phases of the agreement which appear to be free from dispute. We will now consider parts upon which the testimony is in conflict. The plaintiffs acknowledge that the agreement bound them to pay the defendants' road expenses, such as the cost of the Diesel motor fuel, for each round trip to the Middle West. But they claimed that when they had paid for those expenses they owed the defendants nothing more. If their version is correct, then the contract required them to do nothing more than help the defendants get an eastbound cargo and pay the round-trip road expenses. Having done that, they had performed their part of the undertaking and the defendants were required to haul the eggs westerly without further compensation. Upon the other hand, the defendants testified that they were entitled to receive 25 cents per mile for hauling the eggs. They ackowledged that the plaintiffs paid at least some of the road costs. Evidently it was the defendants' position that they were entitled, not only to some of

the road costs, but also to 25 cents per mile for the transportation of the eggs. The sharp conflict in the testimony given by the parties is indicated in an answer made by Dicillo when he protested that the first time that he heard that the plaintiffs were required to pay 25 cents per mile was "right here in this courtroom."

The venture which we have been describing got under way in the early part of January, 1951. At that time the defendants hauled easterly a load of produce and, after delivering it, filled their truck with cases of eggs at Litchfield, Minnesota. Pursuant to the plaintiffs' instructions, the eggs were unloaded either at Spokane or Walla Walla. Then more trips were made. Some of the eggs in the first load became frozen enroute and because of that fact the plaintiffs later made a charge against the defendants in the sum of $225. The defendants swore that the freezing of the eggs was due to no fault of theirs and contested the plaintiffs' right to hold them responsible. When the defendants entered Montana with the second shipment of eggs they encountered low temperatures and discovered that under a "frost law", promulgated for the preservation of the pavement in periods of cold weather, they were overloaded. They were forced to transfer a part of the lading to another carrier, and the latter's charge for the service became the subject matter of more dispute. We speak of those facts for the purpose of indicating the contentious state of the parties' relationship and the nature of the issues which were developed at the trial.

We have mentioned the fact that after the parties had operated under their embattled agreement for about three months, the defendant, F. L. Osborn, withdrew. About that time the contract was revised, for we observe that L. C. Osborn, who remained with the venture, no longer drove to the Middle West, but in

the succeeding months made trips for the plaintiffs to Petaluma, California. In the early part of July, 1951, the operations came to a close.

In the six months that the agreement remained in effect no accounting took place, with the exception of a futile effort which we will shortly mention. The defendants did not indicate to the plaintiffs at any time how far their truck had been driven, and the plaintiffs rarely informed the defendants of any charge which they made against them. According to defendant L. C. Osborn, the plaintiffs made no intimation of a purpose to charge the defendants for the frozen eggs until the middle of March. Likewise, it seems that the plaintiffs' charges against the defendants arising out of the overload remained unmentioned for a long time. In March, 1951, the parties met, discussed the state of their affairs and unsuccessfully attempted to adjust them.

In view of the unsettled state of the parties' accounts, it is not surprising that, although this is an action of replevin, predicated upon the complaint's charge that the plaintiffs are "the owners of and entitled to the possession" of the trailer, the course of the trial took upon itself the aspects of an accounting.

When the agreement was effected, the trailer was in Los Angeles. The plaintiff Johnston testified that it was "in hock." Shortly the defendant L. C. Osborn went to Los Angeles to bring the vehicle north, but discovered that he could not obtain its possession without paying the concern that held it $600. Upon his request, the plaintiffs sent to him by telegram the needed sum of money. This resulted in a charge against the defendants of $606.06. It developed that the trailer needed new tires, and the plaintiffs authorized the defendants to obtain them upon the plaintiffs' credit. They cost $466.70. Presently another tire had to be purchased and this required an additional outlay of

$216.10. Again, the purchase was made upon the plaintiffs' credit. We infer that the plaintiffs presented those facts for the purpose of establishing an interest upon their part in the trailer. However, when the advances were made, no word was uttered indicating that an interest in the trailer—security or otherwise— was passing to the plaintiffs. When the trailer reached Portland, the plaintiffs made no intimation that they deemed themselves its owners or that they had any authority over it. The record contains evidence which, if believed, shows that when the plaintiffs disbursed the aforementioned amounts they were indebted to the defendants in a sum greater than the total disbursements. The indebtedness, if it existed, arose out of the fact that the defendants had sold to the plaintiffs some of the eggs which they brought from Dell Rapids, South Dakota, on December 25, 1950. The evidence concerning the sales appears to be uncontradicted and indicates that the plaintiffs purchased the eggs at a price of not less than $1,865.70.

We have mentioned the fact that March 2, 1951, the secretary of state, at the instance of the defendants, transferred the certificate of title covering the trailer to the plaintiffs. After the trailer was brought north, the name "Oregon Egg & Poultry Company" was painted on both of its sides. March 2, 1951, according to Johnston, the defendants were indebted to the plaintiffs in the amount of $2,500 or more, and title was transferred in consideration of that debt. Referring to the defendant L. C. Osborn, Johnston's words were: "He said to us he was transferring the title to us in consideration of this money which we were advancing on this trailer to make it possible for them to obtain it." The money which had been disbursed in order to enable the defendants to bring the trailer to Portland was the aforementioned amounts of $606.06,

$466.70 and $216.10. If the plaintiffs at that time were indebted to the defendants in a sum greater than the total of those three figures, the purported consideration did not exist. Johnston, however, indicated in further testimony that the consideration was not only the three sums just mentioned, but also "numerous other instances" in which money was paid to the defendants by the plaintiffs. He conceded that when title was transferred, nothing was said as to the amount which the defendants were entitled to receive for the trailer, and admitted that if the defendants paid the plaintiffs the amount of the purported debt, the plaintiffs would be bound to restore title to the defendants. Although the title was transferred to the plaintiffs' name, the plaintiffs never had possession of the vehicle.

The defendants denied that they were indebted to the plaintiffs when title to the trailer was transferred. The defendant L. C. Osborn gave an account very different from that of the plaintiffs as to the reason why title to the trailer was transferred to the plaintiffs' name. He made this explanation:

"The reason I transferred it into his name is on account of the insurance and the PUC's and the license. We were hauling back east and having trouble getting across states. It was in my own name. It cost so much to go across different states, Nebraska and all of the Midwest states. Where a company with a name painted on the side and registered in their name, in the PUC's and everything, it was number 3 PUC's, it was easier to go across there with no questions asked, where individuals owned it it was weighed and reweighed and all kinds of delays, but after that there was not."

When the certificate of title was transferred, the other defendant, F. L. Osborn, no longer had an interest in the trailer. He had withdrawn from the venture, no

longer lived in Portland, and was not acquainted with the circumstances attendant upon the transfer.

Before this action was filed, the plaintiffs, according to Johnston's testimony, demanded "our money or demanded the trailer and they refused to give us either the trailer or the money." The phraseology of the demands suggests that the plaintiffs thought they possessed, possibly, a security interest in the trailer.

The foregoing review gives an impression of the course pursued at the trial. We return to the averment of the complaint which is quoted in a preceding paragraph: "* * * plaintiffs now are and at all times herein mentioned were the owners of and entitled to the immediate possession" of the trailer. We know of no interest in the trailer in the form of a lien which the evidence presented by the plaintiffs concerning debits and credits tended to establish. When the evidence which is reviewed in the preceding paragraphs was received, the trial judge ruled that the matter for decision was submitted by the averment just quoted. And we notice that after virtually all of that evidence had been presented, plaintiffs' counsel, in addressing the court, declared: "I can only say this, the allegations of the complaint show that we claim to be the owner of that truck on July 11th, 1951, and that was the testimony of Mr. Johnston." It seems clear that the plaintiffs presented the evidence which revealed charges against the defendants for the purpose of showing that on March 2, 1951, when the certificate of title was transferred to the plaintiffs, the defendants were indebted to them. In that way the plaintiffs sought to prove that the trailer was sold to them and that they became owners, not only of the record title, but also of the beneficial interest. The foregoing reveals the course which was pursued at the trial: (1) the defendants freely admitted, not only from the wit-

ness stand, but also in their pleadings, that the certificate of title was transferred by them to the plaintiffs; and (2) the plaintiffs, with equal freedom, conceded that the defendants had possession of the vehicle from the day it left Los Angeles until the sheriff seized it under the writ of replevin. The matters in controversy at the trial were these: (a) were the defendants indebted to the plaintiffs March 2; (b) did the defendants transfer title to the vehicle merely for the purpose of facilitating the operation of the truck through the midwestern states where trouble had been encountered; (c) did the defendants transfer title to the plaintiffs for a consideration and for the purpose of making the plaintiffs beneficial owners.

We will now consider the assignments of error. The first reads:

"The Court erred in giving the following instruction:

'You are also instructed that the law presumes that a person in possession of property owns it, and that a person exercising acts of ownership over property owns it. If you find that the Trailermobile was in the possession of the defendants Lamonte C. Osborn and F. L. Osborn, or either of them, at the time the paper certificate of title was transferred to the plaintiffs, or the Oregon Egg & Poultry Company, the Osborns, or the persons in possession of the trailer were presumed to have owned it at the time the transfer of the certificate was signed. If you find that the defendants Osborn, or either of them, then continued in possession of the trailer after the certificate of title was assigned, or after the certificate of title was issued to Oregon Egg & Poultry Company, and until the action to recover was filed, which was July 11, 1951, then the Osborns are presumed to have continued to own the trailer and to have the right to possession.' ''

Before the trial judge gave the instruction just quoted, he had told the jury:

"The Court instructs the jury that the law directs that certain presumptions are to be drawn from particular facts.

"You are instructed that the certificate of title issued by the Secretary of State of the State of Oregon is prima facie evidence of ownership of a vehicle, and, therefore, if you find from the evidence that on the day the lawsuit was filed, which is the 11th day of July, 1952—is that '52 or '51?

"MR. REITER: '51.

"THE COURT: July 11, 1951, the plaintiffs held a certificate of title duly issued by the Secretary of State of the State of Oregon to the Trailermobile which is the subject of this controversy, then I instruct you that the presumption is that the plaintiffs were the owners and entitled to the immediate possession of the vehicle."

Then the instructions continued with the one which we have quoted and which is challenged by the present assignment of error. The exception to the instruction which is under review reads as follows:

"I want to take an exception to the Court instructing the jury that possession of the vehicle raises a presumption of ownership, on the ground that the statutes particularly provide under the Motor Vehicle Act that the title certificate is presumptive evidence of ownership and that the general law of personal property on possession and possession of motor vehicles does not give a presumption in a motor vehicle situation."

ORS 41.360 lists among the disputable presumptions created by that section of our laws the following:

"(11) Things in the possession of a person are owned by him.

"(12) A person is the owner of property from exercising acts of ownership over it * * *."

ORS 481.405 to 481.415 regulate the transfer of the ownership of motor vehicles, and ORS 481.105 makes provision for "an application for registration". ORS 481.110 delineates the manner in which the certificate of title is issued. ORS 481.115 says:

> "* * * The certificate shall be prima facie evidence of the ownership of such vehicle or of an interest therein."

The certificate of title which the secretary of state issued to the plaintiffs contained this heading: "Legal Owner or Mortgagee, If Any." At that point the plaintiffs' partnership name appeared.

It will be noticed that the assignment of error under review is based upon the instructions which were given to the jury and that it does not pertain to a ruling upon a motion for nonsuit. From the standpoint of legal technique, a presumption performs its greatest service at the hour when a motion for nonsuit is submitted for decision. In *Alpine Forwarding Co. v. Pennsylvania R. Co.*, 60 F2d 734, Judge Learned Hand declared:

> "* * * If the trial is properly conducted, the presumption will not be mentioned at all—though the judgment need not of course inevitably be reversed if it is—but the jury will merely be told to decide upon the whole evidence * * *."

See, also, McCormick on Evidence, § 314. However, in this jurisdiction, where a presumption is deemed to possess probative qualities (*Wyckoff v. Mutual Life Insurance Co.*, 173 Or 952, 147 P2d 227), the suggestion of Judge Hand must generally be disregarded. Acquainting the jury with the applicable presumption imparts to it wise guidance. McCormick on Evidence, § 314.

The only person, apart from the plaintiffs and the defendants, who testified in this case was an insurance agent whose testimony was limited to the details of a policy of insurance. He gave no testimony bearing upon any issue submitted by the assignments of error.

From the foregoing we see that if the defendants in fact sold the trailer to the plaintiffs, the latter and the defendant L. C. Osborn were intimately familiar with the transaction. Every incident which occurred from the day the parties became acquainted until the hour when the sheriff seized the trailer, and which could have proved or disproved the sale, was recounted from the witness stand in elaborate detail. Nothing was left undisclosed or to be surmised by inference or presumption. The parties were not in disagreement upon the subjects of possession or certificate of title. The issue between them centered in the state of their account on March 2 and in what was said on that day when the certificate of title was transferred. We infer from the record that neither the plaintiffs nor the defendants depended upon a presumption to establish their respective claims to ownership, for no instruction upon that subject was requested.

■■ It is apparent from the plaintiff's brief that their objection to the challenged instruction is not based upon a contention that possession does not authorize a presumption of ownership. Their position is thus stated in their brief:

"We believe the rule to be that where two presumptions arising out of the same factual situation conflict in that each of the parties to the cause may claim the benefit of a presumption favorable to himself, and the truth of one would disprove the other, then one presumption must give way in favor of the other. The weaker must fall, and the party losing the presumption may only rely on the inferences which may remain as part of his case. It is the duty

of the Court to determine the stronger of the presumptions and to determine as a matter of law which must prevail.''

Thus, the plaintiffs deem that the evidence developed conflicting presumptions. They believe that (1) the certificate of title and ORS 481.115 authorized a presumption of ownership in their favor, and (2) the defendants' possession of the vehicle and ORS 41.360, subds. 11 and 12, authorized a presumption of ownership in the defendants, unless the presumption created by ORS 481.115 overcame the one resulting from ORS 41.360, subds. 11 and 12. The plaintiffs argue that the trial judge should have ruled that the presumption of ownership which ORS 481.115 creates in favor of the holder of a certificate of title is stronger than the presumption of ownership which ORS 41.360, subds. 11 and 12, authorize in behalf of a party who is in possession of the vehicle. They argue that the trial judge should not only have made the ruling suggested by them, but should have said nothing to the jury concerning the presumption arising out of possession. The two presumptions are, seemingly, based upon probabilities, and are in large part procedural devices which affect the duties of the respective parties in coming forward with proof. A party favored by the presumption created by ORS 481.115 may rest upon his presumption, for it creates a prima facie case in his behalf. Unlike presumptions in favor of marriage and legitimacy, the two presumptions created by the sections of our laws above cited are not concerned with any social policy of the state. We know of no basis whereby a court can, as a matter of law, say that either of the two presumptions is stronger than the other. We do not believe that the quandary precipitated by the evidence can be solved in the suggested manner.

An averment of the answer states:

"That on or about March 2, 1951, the defendant, LaMonte C. Osborn, at the request of the plaintiffs and for the convenience of the plaintiffs and defendants, assigned and transferred to the plaintiffs, under the name of Oregon Egg & Poultry Company, the registered record title to said trailermobile, and thereafter the Secretary of State for the State of Oregon issued to Oregon Egg & Poultry Company certificate of title No. 1715023 for said trailermobile and State of Oregon 1951 license plate No. 7-29744.

"That the aforesaid registered record title was assigned and transferred to the plaintiffs under the name of Oregon Egg & Poultry Company, and consent given by LaMonte C. Osborn to the issuance of the aforesaid certificate of title by the Secretary of State for the State of Oregon for said trailermobile to Oregon Egg & Poultry Company under and pursuant to an understanding and agreement between the plaintiffs and the defendants that the Oregon Egg & Poultry Company should hold certificate of title to said trailermobile for the exclusive use and benefit of the defendants; that the defendants should continue to be the sole and complete owners of said trailermobile and continue to have the sole and complete possession and use of said trailermobile. That the plaintiffs would cause the aforesaid certificate and record of legal title to said trailmobile to be assigned, transferred and delivered to the defendants or to whomsoever the defendants should direct whenever requested by the defendants. That the plaintiffs never paid any consideration for said trailermobile or for the assignment or transfer of the certificate or record of title to the same to the Oregon Egg & Poultry Company."

■■ The averment of the answer of which we have just taken notice established, as a matter of judicial admission (Wigmore on Evidence, 3d ed, § 2596), the fact that the plaintiffs on March 2, 1951, were entitled to have the Trailermobile registered in their names

as owners. ORS 481.110, in referring to the secretary of state, says:

"* * * The department, if satisfied that the applicant is the owner or legal owner of such vehicle or is otherwise entitled to have it registered in his name, shall thereupon issue in the name of the applicant and deliver to the legal owner or mortgagee, if any, otherwise to the applicant, an appropriate certificate of title * * *."

ORS 481.115 declares:

"The certificate mentioned in 481.110 shall * * * contain such description and other evidence of identification of the vehicle as the department deems proper, together with the name of the owner or legal owner. The certificate shall be prima facie evidence of the ownership of such vehicle or of an interest therein."

We think it is clear that the presumption created by ORS 481.115 indicates nothing more than that the party named in the certificate of title is the repository of title. It does not undertake to signify whether or not he is the beneficial owner.

Frequently when a party is met with an adverse presumption, he seeks to meet it by disproving the basic facts upon which it rests. The defendants, however, conceded the presumption which the plaintiffs had invoked and also the basic facts upon which it rested, but since that presumption is silent upon the subject of beneficial interest, the defendants felt themselves at liberty to present evidence that they had never parted with the beneficial interest in the vehicle. Since the party who has the beneficial interest in an article normally has its possession, the defendants' unchallenged possession of the trailer and their daily use of it could readily warrant an inference that they were the beneficial owners. It could also create in their favor the presumption warranted by ORS 41.360, subds.

11 and 12. We surmise, however, that since they asked for no instruction upon the subject of that presumption, they did not solicit its aid. In all likelihood, the instructions, in using the words "presumes" and "presumed", employed them as the equivalents of "infers" and "inferred". Or, possibly, the instructions used the words which we took from them as synonymous of "presumption of fact". We observe that Wigmore on Evidence, 3d ed, § 2491, disfavors the use of the term "presumption of fact". Whether or not the instructions, in speaking of a presumption of ownership arising from possession, had reference to ORS 41.360, subds. 11 and 12, or the inference which reason draws in favor of ownership from one's daily use and possession of a vehicle, we think the exception did not single out any error.

■ The first assignment of error, in our belief, possesses no merit.

■ The second assignment of error reads as follows:

"The Court erred in giving the following instruction: 'If you believe from the evidence submitted in this case that it was not an outright conditional sale of the trailer to the plaintiffs, the plaintiffs cannot recover and your verdict should be for the defendants.'"

The exception follows:

"I except to the giving of the instruction to the effect that plaintiff must show a complete and unconditional sale, for the reason that the law does not require the plaintiff to show how he obtained title, but the fact that on the day he had title and was entitled to the right of possession, whether he got it by sale or gift, or found it, or it was delivered to him, has no significance in this case, and the Court has told the jury there must be a sale, which is not the law."

The instructions had stated to the jury:

"I instruct you that if you find from a preponderance of the evidence at the time of the commencement of this action the plaintiffs were the owners and entitled to the immediate possession of the Trailermobile, and that the same was in the possession of the defendants, or either of them, then you will find your verdict in favor of the plaintiffs."

They also stated:

"You are instructed that the ownership of a vehicle of the character described in the complaint does not depend upon the certificate of title issued by the Secretary of State of the State of Oregon, or upon the registration or the license of the vehicle. Ownership and right to possession may be proved by any evidence, written or oral, which you may believe to be correct."

We notice that the defendants' exception to the challenged instruction was on the ground that "the law does not require the plaintiff to show how he obtained title". However, in this case, the complaint, as we have seen, averred that the plaintiffs were "the owners" of the vehicle. We have also noticed that during the course of the trial plaintiffs' attorney told the court: "I can only say this, the allegations of the complaint show that we claim to be the owner of that truck on July 11th, 1951, and that was the testimony of Mr. Johnston." While Johnston was under cross-examination, the following occurred:

"Q You say the Oregon Egg and Poultry Company owned this trailer on March 2nd, 1951?

"A I consider we did, yes.

"Q Where did they get it?

"A Well, we got it through the possession of it, the title which was transferred to us when we put up the money to buy it.

\* \* \* \* \*

"Q  And that is your evidence of ownership, the title, the certificate of title which you hold from the Secretary of State of the State of Oregon which was issued on a title surrendered by L. C. Osborn and assigned to Oregon Egg?

"A  For the title and consideration, yes."

No testimony was given and no claim was made at the trial that the plaintiffs obtained the trailer by "gift or found it or it was delivered to him" or by any other means except through purchase.

The second assignment of merit is lacking in merit.

■ The following is the third assignment of error:

"The Court erred in giving the following instruction: 'If you find that there was not a complete and unconditional sale to the plaintiffs that they are the owners of the Trailermobile, the plaintiffs cannot recover on the assumption that they acquired title as security for indebtedness owing to the plaintiffs by the defendants at the time of the transfer of the certificate of title, or at any time thereafter.' "

The exception reads as follows:

"The Court also instructed the jury that we cannot recover on the security theory. I except to that for the same reason as the other ones I excepted to. (Meaning the same exceptions were to apply to the aforesaid instruction as were taken to the instruction covered in Assignment of Error No. II.)"

Near the close of the evidence and before instructing the jury, the trial judge, in an effort to make certain that he correctly understood the position of the plaintiffs, addressed their counsel in this way:

"The question, Mr. Reiter, I think we can understand ourselves, the question submitted to this jury is whether on July 11th, 1951, the plaintiffs were the owners and entitled to the possession of the trailer * * *. They claim they are the owners of it, * * *. Now I think that they do not claim that

they hold it by no possessory lien for any mortgage, am I right in that, Mr. Reiter?

"MR. REITER: I claim that on July 11th, 1951, Oregon Egg and Poultry were the owners.

"THE COURT: You were the owners."

After more colloquy, the trial judge summarized in these words his understanding of the position taken by the plaintiffs:

"They don't claim there was no equitable mortgage, they just claim they own it."

We have stated the defendants' exception as it is indicated in the bill of exceptions. At the conclusion of the words which we quoted, defendants' counsel continued in this way:

"The Court also instructed the jury that we cannot recover on the security theory. I except to that for the same reasons as the other one that I excepted to."

At that point the trial judge declared:

"Exceptions allowed. You stated in open court before the jury you are standing on the contention you are the sole owners and you purchased it."

Plaintiffs' counsel made no reply to that statement. He went on and excepted to other parts of the instruction.

The third assignment of error, in our belief, reveals no error.

The fourth, being the last, assignment of error, is predicated upon a ruling which sustained objections made by the defendants when the plaintiffs offered in evidence 53 documents which were receipts, canceled checks and statements of account. The ruling was made while the plaintiffs were offering rebuttal testimony and while Mr. Johnston was upon the witness stand. Earlier in the trial, before the plaintiffs had rested and

while Mr. Johnston was giving testimony, it developed that he had written a letter to the plaintiffs' counsel January 14, 1953, which discussed at length the state of the account between the parties. Attached to the letter was a detailed statement of the plaintiffs' charges against the defendants and of credits which the plaintiffs had entered in their favor. The first page of this statement contained this heading: "List of moneys expended to and for Flayton and LaMonte Osborn". Under that title were four columns headed as follows: "Date, Items, Ck or Invoice, Amount". The statement contained 61 charges against the defendants with appropriate data in the four columns. After the final entry there appeared this: "Total $8,116.79". Under that total was a credit of $132.56 followed by the entry of a balance of $7,984.23. The notation of the balance was succeeded by another heading which read: "Osborns paid us". That heading was followed by six entries showing payments made by the Osborns which totaled $5,165.20. The final entry was this: "Balance due us, $2,819.03". The letter explained some of the entries and the manner in which Mr. Johnston had gathered from the books and files of the partnership the information reflected in the statement. The defendants tendered the letter and its accompanying document in evidence. The tender was received without objection. The entries of which we have just taken note purported to represent the balance which the defendants owed the plaintiffs. During the course of the trial, the charges shown in the aforementioned statement of account received mention and explanation. Upon rebuttal, after the defendants had rested and shortly before the trial closed, the plaintiffs offered the supporting documents which we have mentioned and which, upon being excluded, became the subject matter of the assignment of error now under

consideration. No explanation was made for the delay in producing the supporting documents.

In support of this assignment of error, the plaintiffs do not contend that the letter of Mr. Johnston which discussed the account, and the statement of accounts which accompanied it, contained any error whatever. Far from so contending, they claim that the receipts, canceled checks and statements of account supported and confirmed the statement. Before the ruling challenged by this assignment of error was made, the trial judge made this inquiry: "All of these exhibits from 11 to 64 are merely cumulative, are they not?" and received this reply from plaintiffs' counsel: "They are explanatory, corroborative."

■ We think that the exhibits that were excluded were cumulative. Generally, the exclusion of evidence, cumulative in character, affords no basis for a reversal. 5 CJS, Appeal and Error, §§ 1715 and 1739; and 3 Am Jur, Appeal and Error, § 1031. We believe that principle is especially applicable in this case in which virtually every charge against the defendants was the subject matter of elucidation from the witness stand. The issue between the parties was not whether or not the various disbursements were made, but whether or not some of them, which the defendants singled out, were chargeable to the defendants.

We do not believe that this assignment of error possesses merit.

The judgment of the circuit court is affirmed.